1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
2                           EASTERN DIVISION

3   UNITED STATES OF AMERICA,        )
                                     )
4              Plaintiff,            )
                                     )
5         vs.                        ) No. 19-cr-00055-2
                                     )
6   DWAYNE LIBERTY,                  ) Chicago, Illinois
                                     ) July 23, 2020
7              Defendant.            ) 2:37 p.m.

8
                 TRANSCRIPT OF PROCEEDINGS - SENTENCING
9
                BEFORE THE HONORABLE ANDREA R. WOOD
10

11  APPEARANCES:

12  For the Plaintiff:      HONORABLE JOHN R. LAUSCH, JR.
                            UNITED STATES ATTORNEY
13                          BY:  MR. TIMOTHY J. STORINO
                            ASSISTANT UNITED STATES ATTORNEY
14                          219 South Dearborn Street
                            Chicago, Illinois 60604
15                          (312) 353-5347
                            Tim.storino@doj.gov
16
    For the Defendant:      RAMIREZ LAW
17                          BY:  MS. VIVIANA RAMIREZ
                            408 North Lake Street
18                          Aurora, Illinois 60506
                            (630) 340-3391
19                          Vramirezlaw@gmailcom

20  Also Present:           Ms. Danielle Stern, U.S. Probation

21

22
    Court Reporter:         Brenda S. Tannehill, CSR, RPR, CRR
23                          Official Court Reporter
                            219 South Dearborn Street, Suite 1928
24                          Chicago, Illinois 60604
                            (312) 554-8931
25                          *brenda_tannehill@ilnd.uscourts.gov*

1        (Proceedings heard in open court:)

2            THE COURT:  Call the case.

3            THE CLERK:  19 CR 55, United States of America versus

4    Liberty.

5            MR. STORINO:  Good afternoon, Your Honor.

6    Timothy Storino on behalf of the United States.

7            MS. RAMIREZ:  Good afternoon, Your Honor.

8    Viviana Ramirez here with Mr. Dwayne Liberty present in court.

9            THE PROBATION OFFICER:  Good afternoon, Your Honor.

10   Danielle Stern on behalf of Probation.

11           THE COURT:  Okay.  Good afternoon, everyone.  First

12   of all, thank you for observing all of the procedures that we

13   have put in place to keep everybody safe for this proceeding.

14           I'm just going to remind everybody who's in the

15   courtroom that today, I'm going to expect you to wear your

16   mask at all times with two exceptions.  I believe we've

17   provided some water to those who are going to be doing a lot

18   of speaking today.  If you do need to take a sip of water, I

19   would ask that you do so quickly and move your mask just for

20   that purpose and sort of turn the other direction, take a sip

21   of water, and then place your mask back on.

22           And then there will be a point today when Mr. Liberty

23   will have an opportunity to make a statement on his own

24   behalf.  Because I feel it's important for me to be able to

25   see him as he's making that statement, I am going to permit

1   him to remove his mask at that time.  Okay?  But other than

2   that limited exception, I would just ask everybody to continue

3   to wear your mask.

4          If the court reporter has any difficulty hearing you

5   speak, she's going to let me know or let you know, and we'll

6   deal with it.

7          Everybody has their own microphone which has a

8   protective covering over it, as you'll see, so feel free to

9   get as close to it as you need to in your mask in order to

10  make sure that you are heard.

11         And then finally, we are asking people to maintain

12  the 6-foot social distancing distance today.  I see that those

13  of you who are in the benches and the gallery are spaced

14  apart.  Thank you for that, and I would just ask everybody

15  else in the courtroom to do the same.  If, for some reason,

16  you need to move and you're afraid that you can't keep the

17  distance, let me know, and we'll figure it out.

18         Other than that, I expect things to proceed as normal

19  today.

20         Is the Government ready to go forward?

21         MR. STORINO:  Yes, Your Honor.

22         THE COURT:  Is the defense?

23         MS. RAMIREZ:  Yes, Your Honor.

24         THE COURT:  Then I'm going to ask that Mr. Liberty be

25  placed under oath.  If you would raise your right hand.

1       (The defendant was duly sworn.)

2       THE COURT:  Okay.  So in advance of the hearing

3  today, I did receive the materials prepared by Probation,

4  including the Presentence Investigation Report and the

5  recommendation from the probation office.

6       I also received a sentencing memo on behalf of the

7  defendant with exhibits including letters of support for

8  Mr. Liberty.  And then I also have a sentencing memo that was

9  prepared by the Government.

10       Let me start by asking Mr. Storino, are there any

11  other written materials that the Government is planning to

12  offer into the record today?

13       MR. STORINO:  Nothing written, Your Honor.  I have

14  seven photographs that I would just like to make part of the

15  record.  You already have copies of these photographs, Your

16  Honor.  They are scattered throughout the Government's

17  version.  So you've seen the photographs; however, I made them

18  a little bigger.  And so I just want them to be part of the

19  record on appeal.  I gave a copy to defense counsel.  I have a

20  copy for the Court.  I can provide it at any time during the

21  hearing, but you've seen all these photographs, Your Honor.

22       THE COURT:  Are you going to refer to them during

23  your argument?

24       MR. STORINO:  I'm just going to refer to them when we

25  talk about brandishing versus otherwise use, so I will mention

1    them at that point.  Otherwise, I don't intend to use them.

2          THE COURT:  Okay.  And were the victims informed of

3    this hearing today?

4          MR. STORINO:  Your Honor, we have been discussing the

5    matter with the victims.  I've talked to at least one victim

6    personally.  They knew of the hearings, they've been tracking

7    the case, and it's my understanding that they do not want to

8    participate today.

9          THE COURT:  Is there anybody else other than yourself

10   that you would like to have speak as part of this proceeding?

11         MR. STORINO:  No, Your Honor.

12         THE COURT:  Okay.  And does the Government have any

13   objections or corrections to the Presentence Investigation

14   Report?

15         MR. STORINO:  I do not, Your Honor.

16         THE COURT:  Ms. Ramirez, do you have any other

17   documents or written materials that you would like to offer

18   into the record?

19         MS. RAMIREZ:  No, Your Honor.

20         I do have a family member, Patrice Liberty.  She is

21   the -- she stepped out, Your Honor, but she would like to say

22   a couple of things to the Court, so we would appreciate that

23   opportunity once the appropriate time gets here.

24         THE COURT:  That would be fine.

25         So my normal practice is to have family members and

1    other supporters speak after I hear arguments from the

2    attorneys but before the defendant makes his statement.  I

3    know sometimes, for family members, everything's very

4    stressful and they'd prefer to get it out of the way at the

5    beginning, and I will accommodate that if that's a preference.

6         Do you know, Ms. Ramirez, if they would rather go

7    first or wait until after hearing the arguments?

8         MS. RAMIREZ:  Your Honor, I think Ms. Liberty will

9    speak when the Court prefers.  I think the reason she stepped

10   out is she does have a very serious medical condition.  And so

11   I know that it will be difficult for her to come and go, but

12   whenever the Court's ready, we'll just let her know, and she

13   can make her way to the microphone.

14        THE COURT:  Okay.  That's fine.  And I do usually

15   have the family members speak towards the end because then

16   they have an idea of the types of things that I'm considering

17   and that they might want to add if there's something that they

18   haven't heard anybody else mention that they'd like to have in

19   the record.

20        Have you had a chance to go over the Presentence

21   Investigation Report with Mr. Liberty?

22        MS. RAMIREZ:  I have, Your Honor.

23        THE COURT:  And do you believe you've answered all of

24   his questions?

25        MS. RAMIREZ:  I do.

1    THE COURT:  I know that there's an objection to the

2    guideline calculation.  Are there any other objections or

3    corrections that you would raise to the report?

4    MS. RAMIREZ:  No, Your Honor.  Just when we get to

5    the part on the mandatory versus discretionary conditions,

6    there is just one, and I'll address that at that time.

7    THE COURT:  Okay.  Mr. Liberty, if you can lean

8    towards your microphone.  Have you had a chance to go over the

9    Presentence Investigation Report with your attorney?

10   THE DEFENDANT:  Yes, Your Honor.

11   THE COURT:  And did she answer any questions you had

12   about that document?

13   THE DEFENDANT:  Yes, Your Honor.

14   THE COURT:  Do you need any more time to speak with

15   her before we continue today?

16   THE DEFENDANT:  No, Your Honor.

17   THE COURT:  Then we will continue.

18   I'll start by noting for the record that back on

19   June 13th of 2020, Mr. Liberty did plead guilty to Count 2 of

20   the indictment against him which charged him with carjacking

21   in violation of 18 USC Section 2119.  Specifically,

22   Mr. Liberty and two other individuals with the intent to cause

23   death and serious bodily harm took by force, violence, and

24   intimidation a motor vehicle that had been transported,

25   shipped, and received in interstate commerce from the person

1    in presence of the two victims, and he is now prepared to be

2    sentenced.

3         The first step in sentencing is, of course, to

4    determine the correct guideline range.  After *United States v.*

5    *Booker*, the sentencing guidelines are not mandatory, however,

6    I do have to consider them in connection with a sentence.

7         So the first thing that I will do is calculate the

8    guideline range.  I will then consider any formal departures

9    that any side may wish to raise, and I'll hear arguments on

10   the sentencing factors under 18 USC Section 3553(a).

11        I did request that a Presentence Investigation Report

12   be prepared by the Probation Office in this matter.  Probation

13   determines that Mr. Liberty has a total offense level of 25, a

14   criminal history category of III, and a resulting guideline

15   range of 70 to 87 months.

16        That calculation was based on a base offense level of

17   20, a six-level increase because a firearm was otherwise used

18   in the offense which means that the conduct did not amount to

19   the discharge of a firearm but was more than brandishing,

20   displaying, or possessing a firearm.  That adjustment is

21   contested by Mr. Liberty.

22        Probation did add an additional two levels because

23   the offense involved carjacking and then reduced the offense

24   level by three, two levels for acceptance of responsibility

25   under 3E.1A and an additional one level under 3E1.1B.  And all

1    of this led to the conclusion that Mr. Liberty has a total

2    offense level of 25.

3              As I understand it, the defense is going to argue

4    that instead of a six-level increase for the use of a firearm,

5    it should be a five-level increase which would result in a

6    guideline range of 63 to 78 months based on an offense level

7    of 24 and a criminal history category of III.

8              Are there any other guideline issues other than the

9    firearm adjustment that the parties would like to raise today?

10   Anything from the Government?

11             MR. STORINO:  No, Your Honor.

12             THE COURT:  From the defense?

13             MS. RAMIREZ:  No, Your Honor.

14             THE COURT:  So I have read the materials, but I would

15   welcome any additional argument that the parties have on the

16   guideline issues.  I'll start by letting the Government go

17   first as the party with the burden here.  Mr. Storino.

18             MR. STORINO:  Thank you, Your Honor.  And I'll just

19   highlight the Government's point here, and I think it's

20   important to note that the definitions in the guidelines

21   really are not helpful.  And that's not me speaking; that's

22   the Seventh Circuit.

23             The Seventh Circuit cases on this issue really

24   criticize the definitions of "brandishing" and "otherwise use"

25   of not really being very clear.  And so I think when you

1  consider that, the answer really is in the case law.  And the

2  case that we found that we cited to the Court is Eubanks, and

3  there, the Seventh Circuit said that, quote, "Pointing a

4  weapon at a specific victim created a personalized threat of

5  harm, warranting an otherwise use adjustment."  Again,

6  "Pointing a weapon at a specific victim created a personalized

7  threat of harm, warranting the otherwise use adjustment."

8          So Your Honor, if you look at the photographs that we

9  put in the Government's version -- I believe they're on

10  Pages 4, 5, and 6 of the Government's version.  And these are

11  the photographs that I've brought here today.  I've enlarged

12  them.  They're in color.  I will submit them to the Court so

13  they are made part of the record.  They are Government's

14  Exhibits 1 through 7.  You see that that is exactly what the

15  three defendants did here, Mr. Carter, Mr. Liberty, and

16  Mr. Gordon.

17          And, of course, under the guidelines, under the

18  definition of "relevant conduct," it does not matter who

19  specifically did what because this was a jointly-undertaken

20  activity, this was in furtherance of the criminal activity.

21  Of course, pointing a firearm at someone assisted them in

22  taking the car from the victims.  And it was reasonably

23  foreseeable to these three carjackers, all of whom had guns,

24  that at some point, a gun was going to be pointed at a person.

25          So I don't think it matters if Mr. Gordon pointed the

1   gun, Mr. Liberty pointed the gun, or Mr. Carter pointed the

2   gun.  And to be fair, based on the photographs, we know

3   Mr. Gordon pointed a gun at the female victim, and that's

4   Government Exhibit 3.  It's also in the Government's version.

5        It happened inside the garage.  Mr. Gordon is

6   pointing the gun directly at the female victim.  The gun is

7   maybe a foot to 2 feet away.  He also appears to be touching

8   her, although I don't think touching is required under

9   *Eubanks*.

10       Government Exhibits 1 and 2, again, these are in the

11  Government's version, and I can hand these to you if you want

12  them with you, Your Honor.  I would just make them part of the

13  record.

14       THE COURT:  I do have the Government's version in

15  front of me, so I think this is sufficient.

16       MR. STORINO:  And I'll describe them to you so you

17  know which ones I'm talking about.

18       Government Exhibit 1 is either Mr. Liberty or

19  Mr. Carter.  The Government does not know.  They have a hooded

20  sweatshirt down, pulled very tight over their head, and a

21  firearm is being pointed directly at the male victim.  The

22  male victim had just thrown his trash out.  He's got his hands

23  up, and I would estimate they're about 3 to 4 feet apart.

24       Government Exhibit 2 is, again, either Mr. Carter or

25  Mr. Liberty.  And this, I would say, is the only photograph

1    where the firearm is not being pointed directly at a victim.

2           So under *Eubanks*, a firearm being pointed directly at

3    a person is otherwise use.  Here, we have two of the three

4    carjackers who have pointed a firearm directly at one of the

5    victims.  One may be a foot away, and the other one 3 to

6    4 feet away.  Your Honor, I believe that's enough for the

7    Government to meet its burden beyond a preponderance of the

8    evidence.

9           THE COURT:  Okay.  Ms. Ramirez.

10          MS. RAMIREZ:  Your Honor, my argument's going to be

11    brief because I did outline our position and the case law that

12    we relied on specifically on Page 3, 4, and top of Page 5.

13          In response, however, -- and I'd like to start with

14    saying the following, Judge.  This is purely a legal technical

15    differentiation which I will attempt to make because in no way

16    do I want to undermine arguments later, the seriousness of the

17    offense, and truly what will hopefully come across to the

18    Court as my client's remorse for his actions.

19          So looking at the *Eubanks* case, this is a 2010 case

20    that the Government cited, and yes, we do agree that that

21    case, pointing a firearm directly at the individual victims,

22    not a group of people, did fall squarely within the definition

23    as interpreted in *Eubanks.*  However, Your Honor, when you look

24    at the *Cureton* case, Seventh Circuit, 2014 that's cited in my

25    position paper and then *Cardena*, a Seventh Circuit 2016 case,

1    what differentiates in my opinion is as the Government has

2    correctly gone through and identified the exhibits and the

3    pictures that do clearly identify Mr. Gordon as he gets out of

4    the car, gun drawn and then, unfortunately, yes, he ends up in

5    that garage with the female victim, there is no issue as to

6    that gun and where it's pointed and the trajectory from

7    Mr. Gordon's leaving the car to his place in the garage.  So

8    that is a very specific, square example of otherwise use, not

9    brandish.

10            We turn to the other photos that detail, and

11   Government --

12            THE COURT:  But isn't that enough, Ms. Ramirez, then?

13   I guess I'm confused.  Are you saying that it does matter

14   whether your client, in particular, was the one who otherwise

15   used the firearm?

16            MS. RAMIREZ:  Your Honor, our argument is that this

17   is akin to a case where although the defendants are

18   responsible for reasonable actions by their codefendants, we

19   are also saying that individual participation, culpability, or

20   actions within that framework should be looked at.

21            And where it is a one-level difference where it's

22   brandishing which is either fully showing the firearm, using

23   to intimidate or, as Mr. Gordon and Carter, where we would say

24   that there is a difference in my client with the gun pointing

25   down as shown in Government's Exhibit No. 6, no other

1  photographs, videos, or images to show that at some point,

2  Mr. Liberty had that gun pointing directly at somebody versus

3  it's clearly visible, used to intimidate.  And so we're saying

4  that is more in line with the brandishing versus the otherwise

5  use.

6         THE COURT:  And I guess I'm trying to distinguish

7  between what would seem to be a 3553(a) argument

8  distinguishing levels of culpability amongst people in the

9  offense versus a very technical application of the guidelines.

10         Do you disagree with the Government's position that

11  for purposes of applying the guidelines, Mr. Liberty is

12  essentially accountable for these reasonably foreseeable

13  actions of his codefendants in furtherance of the offense?

14         MS. RAMIREZ:  I do not disagree with that, Your

15  Honor.

16         THE COURT:  And so if I believe that Mr. Gordon

17  otherwise used a firearm and, I think, from the description in

18  the papers and in the record, it would seem that two of the

19  people involved in this carjacking, one of whom was definitely

20  Mr. Gordon, the other one we don't know who it was, otherwise

21  used a firearm and one person sort of held the gun down at the

22  side and seems to have been pointing it at the ground, -- I

23  don't know whether that was your client or Mr. Carter -- does

24  it matter if I think two out of the three defendants were

25  otherwise using the firearm and the third person was just

1    brandishing it?  Doesn't that third person still get the

2    additional point?

3         MS. RAMIREZ:  Your Honor, we'd make the argument that

4    each of the codefendants should be held accountable

5    specifically whether they were brandishing or otherwise using;

6    however, I understand the Court and the question just asked,

7    and I do believe that I do not disagree with the Government's

8    position that it is reasonable to hold all defendants

9    accountable for the actions of one another.

10        I do think it should be an individual thing, but

11   given that, my fallback position, obviously, as the Court

12   properly stated, could also be a 3553 mitigation.

13        THE COURT:  Did you have additional argument on this

14   point?

15        MS. RAMIREZ:  No, thank you.

16        THE COURT:  Okay.  Any rebuttal, Mr. Storino?

17        MR. STORINO:  Nothing, Your Honor.  Thank you.

18        THE COURT:  Having looked back through the record at

19   what everybody agrees happened and then who's admitted to

20   doing what, I do think it is significant that there are

21   certain actions that the record seems to clearly reveal were

22   taken by Mr. Gordon, certain actions that were clearly taken

23   by Mr. Carter in connection with primarily the first

24   carjacking to which he stipulated but also, to some extent,

25   the second one that Mr. Liberty was involved in.  And then

1   there are certain actions that were taken by one of the

2   defendants, but the record isn't clear as to who did it.

3          There's nothing out of any of those actions that

4   strikes me as being out of line with the offense that was

5   committed such that a particular defendant couldn't have

6   expected it to happen.

7          If you are going to jump out of a vehicle with

8   weapons in order to intimidate people and force them to turn

9   over their vehicle, it seems very reasonable to me that in the

10  course of that, weapons are going to be pointed specifically

11  at those victims in order to get them to do that.  And in this

12  case, the record is clear that both the male victim and his

13  wife had guns specifically pointed at them in order to compel

14  them to get down on the ground and to compel them to turn over

15  the vehicle.

16         That is a specific threat.  It was intended to compel

17  a specific action, and so it seems to me that the distinction

18  between whether Mr. Liberty was the person who just brandished

19  the firearm by holding it and having it be visible as opposed

20  to being the person who actually targeted a person with it in

21  order to intimidate them does not affect the guideline

22  calculation here.

23         I think it does apply that the firearm was otherwise

24  used in connection with the offense, and therefore, the full

25  six-level enhancement applies.

1            That said, I do make note of the point that
2    Ms. Ramirez is making that the Government does not seem to be
3    able to say that her client is the person who took the most
4    egregious actions here in terms of actually putting the gun
5    against either of the victims.  And certainly she can argue
6    that as a 3553(a) factor as to why, in looking at comparable
7    sentencing, that her client should be considered less culpable
8    than the other two, perhaps that his participation was less
9    serious in some way.
10            I'm not saying I would necessarily agree with that,
11    but it's certainly an argument that she can make.  I just
12    think it's more appropriately made under the 3553(a) factors.
13            So I'm going to overrule that objection and, given
14    that there were no other objections to the PSR, find that the
15    calculation of the guideline range there is correct, that the
16    correct guidelines range incorporates a total offense level of
17    25, a criminal history category of III, and an advisory
18    guideline range of 70 to 87 months.
19            Any final comments on that guideline calculation from
20    the Government?
21            MR. STORINO:  No, Your Honor.
22            THE COURT:  From the defense?
23            MS. RAMIREZ:  No, Your Honor.  Thank you.
24            THE COURT:  I believe the parties have framed their
25    sentencing arguments in terms of 3553(a); however, we do still

1    have formal departures under the guidelines.

2           Is there any argument that the Government would like

3    to make under those provisions?

4           MR. STORINO:  No, Your Honor.

5           THE COURT:  The defense?

6           MS. RAMIREZ:  No, Your Honor.

7           THE COURT:  Then we will move to the 3553(a) factors.

8           For the record, I'll note that 18 USC Section 3553(a)

9    provides that I must impose a sentence that is sufficient but

10   not greater than necessary to serve the purposes stated in

11   that provision.  I must consider the nature and circumstances

12   of the offense and the history and characteristics of the

13   defendant.

14          I am also required to consider the need for the

15   sentence imposed to reflect the seriousness of the offense; to

16   promote respect for the law; and to provide just punishment

17   for the offense; to afford adequate deterrence to criminal

18   conduct; to protect the public from further crimes of the

19   defendant; and to provide the defendant with needed

20   educational or vocational training, medical care, or other

21   correctional treatment in the most effective manner.

22          In addition, I must consider the kinds of sentences

23   available; the policies indicated in 3553(a); the need to

24   avoid unwarranted sentence disparities among defendants with

25   similar records who have been found guilty of similar conduct;

1    the need to provide restitution to any victims of the offense;

2    and, of course, the sentencing range under the guidelines.

3          So I'm going to be considering all of those things.

4    I'm going to hear first from the Government, then I'll hear

5    from defense counsel.  And then if there are any friends or

6    family members of Mr. Liberty who would like to speak on his

7    behalf, I would welcome your comments.  And then finally,

8    Mr. Liberty will have a chance, if he chooses, to make his own

9    statement.

10          Mr. Liberty, you don't have to make a statement if

11    you don't want to, but you will have that opportunity.

12          Do you understand that you don't have to make a

13    statement?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  Okay.  First, I'm going to let you hear

16    the arguments that are made before you decide what you want to

17    do.

18          We'll begin with the Government.

19          MR. STORINO:  Thank you, Your Honor.

20          Your Honor, the Government feels that a guideline

21    sentence is appropriate here, a sentence in the middle of the

22    guidelines because I don't think there is aggravation to take

23    it above, and I don't think there's mitigation to take it

24    below the guidelines.  I think the guidelines capture the

25    conduct.

1           So I'll start with mitigation.  To be fair,

2    Mr. Liberty is less culpable, I believe, than his

3    codefendants.  I do.

4           I think clearly, Mr. Carter committed two

5    carjackings.  He pled to two carjackings, and as Your Honor

6    knows, in that first carjacking, he struck the victim with the

7    butt of a handgun.  I don't have any evidence that Mr. Liberty

8    did something like that, I just don't.

9           Mr. Gordon is comparable, too.  Mr. Gordon, of

10   course, hasn't pled guilty.  He's comparable, Mr. Gordon, but

11   as you see in the photos that the Government has submitted and

12   are part of the record, Mr. Gordon, who is not wearing any

13   face covering, runs right up to the female victim who is eight

14   months pregnant, puts the gun very, very close to her, orders

15   her to the ground on her stomach, and he is touching her while

16   he's doing that.

17          Again, I don't have any evidence that Mr. Liberty did

18   something like that.  So I think that's just fair to point out

19   to Mr. Liberty that the conduct of his codefendants was more

20   egregious than his.  But does that mean that this case should

21   be removed from the guidelines?  I don't think so.

22          He does have some mitigation.  Mr. Liberty was never

23   assigned a Social Security number.  Your Honor, to me, that's

24   very unusual.  I've never seen that before.  I'm sure it

25   restricted him in some sense; however, I do think he probably

1    is able to go get that Social Security number and could cure

2    that problem.  So the question is:  Is that something that's

3    so significant that removes the case from the guidelines?  I

4    don't think so.

5         He describes his childhood as okay.  His mother

6    described his childhood much better.  Mr. Liberty acknowledged

7    that no one in his family was abused, and they were not

8    exposed to any violence in the home.  That's in the PSR in

9    Paragraph 60.

10        That's a good thing, obviously; however, that's not

11   the normal case that Your Honor sees day in and day out of

12   persons who are accused of serious crimes.  Oftentimes, we see

13   violence in the home, substance abuse in the home, things like

14   that.  That is not here for Mr. Liberty.  And I think, again,

15   the absence of that indicates that a guideline sentence is

16   appropriate here and that there is not mitigation to go below

17   the guidelines.

18        So Your Honor, you consider his background and then,

19   as a contrast, consider the offense.

20        Your Honor, this offense was traumatizing for the

21   victims.  Three persons at 9:00 a.m. in a carjacked car jump

22   out of that car and I think it's fair to use the word "ambush"

23   these two people as they're going to work.

24        Imagine being in your home as the garage door opens,

25   and within seconds, a gun is pointed in your face.  That is

1    what happened to these two victims.

2           They are then ordered to the ground in their own

3    home.  The female, who is eight months pregnant, visibly

4    pregnant, is ordered to sit on her stomach, lie down on her

5    stomach, as they sort through her purse and look for her keys.

6    Of course, they take the Land Rover and take off.

7           And, Your Honor, committing a crime like this is

8    awful always, right?  There's no justification for it, but

9    even here, to what end did they do this?

10          The car is abandoned within hours on the South Side.

11   They just leave it.  No ostensible reason why this crime is

12   committed except for joy riding.  And then they're back in the

13   other carjacked vehicle, the Toyota Prius.

14          We don't know who was driving, Your Honor.  I can't

15   say whether or not Mr. Liberty was driving, but that car gets

16   into a hit and run, hits a vehicle.  Someone calls the police,

17   thankfully, calls it out, and Mr. Liberty is arrested with

18   Mr. Carter and Mr. Gordon running down an alley by CPD.

19          So that's the offense, Your Honor.

20          And again, I think the guidelines capture the

21   offense, they capture the aggravation, and I don't think it's

22   justified to go above the guidelines.

23          Your Honor, the last thing I'll mention is

24   Mr. Liberty's criminal history.  And, you know, it's

25   strikingly similar to Mr. Carter's because when you look at

1   it, you see relatively minor offenses for what Your Honor is

2   used to, offenses that don't look like they're related to

3   vehicles.

4          You'll remember Mr. Carter had these convictions

5   about resisting and other things like that, but they were all

6   related to the theft of cars.

7          Mr. Liberty's is really the same.  He has one

8   conviction at 17 years old for possessing a stolen car.  He

9   has another conviction in 2015 in which he was, quote,

10  "checking cars."  He was convicted at that time of burglary,

11  but what he was doing is going around a parking lot looking

12  for vehicles.  These are not serious offenses, and he was

13  given leniency.  Not serious sentences.

14         THE COURT:  Is this the first offense, though, where

15  there's sort of a gun involved, a weapon?

16         MR. STORINO:  Absolutely.  And that, to be fair, is

17  different than Mr. Carter.  Mr. Carter had a gun involved in

18  one of his offenses, as Your Honor will remember.

19         But the concerning thing for the Government is,

20  clearly, his conduct was escalating before he was arrested for

21  this offense.

22         The second conviction occurred while he was on some

23  form of supervised release from the first offense, and

24  clearly, his conduct was worsening.

25         And so I think a sentence within the guideline range

1    is appropriate, first of all, to reflect the offense, to

2    reflect what Mr. Liberty and his codefendants did, to reflect

3    putting those victims on the ground, to reflect ambushing them

4    in the morning, to reflect his worsening criminal history but

5    also to reflect his mitigation, his childhood.  Your Honor, I

6    think based on all that, a sentence of 80 months is

7    reasonable.

8           Your Honor, one other correction.  I made the same

9    error in my sentencing memo to Mr. Carter.  I indicated five

10   years supervised release on Page 9 of my sentencing memo.

11   That's inaccurate.  The maximum is three years, but unless the

12   Court has any questions, Your Honor, I don't have anything

13   further.

14          THE COURT:  And does the Government take issue with

15   any of the conditions of supervised release that were either

16   recommended or not recommended?

17          MR. STORINO:  No, Your Honor.

18          THE COURT:  Okay.  Ms. Ramirez, your turn.

19          MS. RAMIREZ:  Thank you, Your Honor.

20          Judge, when I look at this case and the impression

21   that I came into this case after receiving the call and seeing

22   what the charges were, I have now been -- and I've been before

23   the Court before, and so saying this, I haven't had a client

24   prove me more wrong from my initial gut reaction to charges.

25          Your Honor, when I tell you that the very first time

1   I met Mr. Liberty, it wasn't "How much trouble am I in" as it

2   was "How are the victims."  And in every conversation, whether

3   he was at Livingston or whether he was at the MCC, that was

4   one of the main focuses of my conversations with him.

5           When I look at the seriousness of this crime -- and

6   he will be the first to acknowledge it, so in no way will I

7   downplay what those victims felt.  I won't do it because as an

8   attorney, I cannot imagine being one of those people, but I'll

9   also tell you that Mr. Liberty has never downplayed what those

10  victims felt, and not because he's before the Court today but

11  from day one.

12          So do I believe a guideline range sentence is

13  appropriate?  Well, if I just took what the Government said, I

14  would say yes.  The problem, though, is when we go back to the

15  nature, the history and characteristics of Dwayne -- and I say

16  this very respectfully -- I told his family that I would be

17  talking about it -- and when I present what I believe are very

18  serious factors from his childhood that definitely impacted

19  and set him on a course, when he told the probation officer

20  and I his background, it was from a perspective of love.  It

21  was not negative.  It was not casting any negativity on his

22  mother who is here, Patricia, but it was to give me and the

23  probation officer insight.

24          At 15 years old, Patricia finds herself pregnant, a

25  child carrying a child who, for her own reasons, was not able

1  to communicate that to the family.  The whole pregnancy is

2  hidden from the family, and she gives birth unaided,

3  unassisted.  No hospital, no midwife, no one there to help

4  her.

5      It's not until two days later that Dwayne makes it to

6  the hospital.  And he doesn't know what he has.  It's either

7  jaundice hypothermia, he's not sure, but that's what he's been

8  told.

9      His birth was never recorded.  It wasn't reported

10  until later.  And that is why the whole Social Security, the

11  one thing that we use to identify, to get jobs, to apply for

12  benefits, you can't do any of that; but we take it for granted

13  because we've never had to fill something out and say, "I

14  don't have one."  So it is a significant identifying factor

15  that every person that lives in the United States needs.  He

16  has never had that.

17      What astounded me was when he told me the story of

18  his background, it wasn't pity party, it wasn't "Poor me."  It

19  was like, "No, you know, this is what happened," but it was

20  still from a perspective of love toward his family.

21      He suffered from anxiety and depression through his

22  childhood, and that was not diagnosed.

23      His family is a very loving, wonderful family.  Every

24  time I've talked to them and his grandma, Elise, his biggest

25  supporter, those letters describe the young man that I have

1    had the benefit to get to know throughout this case.  He's

2    positive, he's thoughtful, and he's the first to say, "Man, I

3    messed up" and "Why I messed up."

4          So if we look at the circumstances surrounding his

5    birth, the lack of any prenatal or postnatal care that he may

6    have needed initially and what consequences in that

7    development, how they may have affected him, I believe that

8    it's significant.

9          His mother, hard working, was gone a lot.  That's not

10    a bad thing.  It's in the report.  And he reports it as "Mom

11    was a hard worker.  She did what she needed to do to support

12    us."  But he also started to think, "I want to be the man of

13    the house.  How can I contribute?"  And he was not able to.

14          He gets diagnosed, and finally, when he gets

15    arrested, he gets in Cook County Jail, and that's when he

16    starts anxiety and depression medication.  And as a result of

17    various medications, he is now on a medication that works for

18    him.  And I think that contributes to the clear thinking and

19    his ability to now instead of having the override of anxiety

20    and depression, he now has a clear thought of "This is my path

21    going forward."

22          So there has been a psychological and emotional

23    maturity that he can attest to as a result of being able to

24    have his mental health conditions addressed.

25          When I've talked to Mr. Liberty while he was at

1    Livingston, he let me know, "I'm going to AA classes.  I'm

2    attending religious studies."

3         You know, he was just so excited to be able to

4    finally start working on his GED.  And when we were talking to

5    the probation officer, one of the careers he was thinking of

6    is maybe "I can be an underwater welder."

7         And just the fact that he would sit there and think

8    about, "What can I do in the future," Your Honor, I'm

9    representing that I personally believe this young man has a

10   lot of potential.

11        Does there need to be a serious punishment because of

12   the seriousness of the actions?  Absolutely.

13        When I looked at the pictures and after talking to

14   Dwayne and getting to know him, and Exhibit 7, Your Honor, if

15   this exhibit doesn't illustrate what I truly believe, when he

16   gets out of that car, he's looking down, that gun is down.  I

17   absolutely know that he's as responsible as his codefendants

18   for the trauma caused, and he'll tell you he is, but this

19   picture, to me, puts in perspective the young man that I've

20   gotten to know.

21        So looking down the road, we find a punishment that

22   is sufficient but not greater than necessary that gives him

23   the opportunity to get schooling, to finish his GED.  We

24   combine that with the strong family support that although has

25   been there, now he's able to appreciate, utilize, and it's

1    brought that family together.

2          You have three beautiful, strong women in the court:

3    His mother, his grandmother, and his auntie who wants to speak

4    to the Court today.

5          And one of the things, too, in his mind that he

6    wanted me to make sure you knew, Judge, he understood that the

7    video sentencing was probably the safest for everybody.  This

8    was not a selfish act.  This is because he doesn't know that

9    his favorite auntie, she may not be alive when he gets out.

10   That is why we're here present, and we appreciate everybody

11   accommodating us.

12         Your Honor, I can't impress upon you more that this

13   is a thoughtful young man who I've already committed to doing

14   what I can to help him get that Social Security number and to

15   supporting him when he gets out and building a relationship

16   with his family so that they know that they have an extra

17   layer of support.  And that is a commitment that I've made to

18   him, that I will make to the Court and I'm hoping you take

19   into consideration when we think what is a sufficient sentence

20   that's not greater than necessary that does deter, that does

21   address the public, that does protect the public but that also

22   says this young man has so much potential, let him prove it.

23   And we submit, Your Honor, that hopefully, a sentence below

24   the guideline range is appropriate for the Court.

25         Thank you so much.

1          THE COURT:  Ms. Ramirez, if you know, what is his

2   plan then for once he's released?  I know he's working towards

3   his GED.  He mentioned wanting to be an underwater welder.  Is

4   that sort of the ultimate plan?  I assume he's hoping to get

5   his Social Security number so that he can work, --

6          MS. RAMIREZ:  Well, absolutely.

7          THE COURT:  -- gets his GED.  And then what?

8          MS. RAMIREZ:  So it all starts with that Social

9   Security number, it all starts with the GED and the classes

10  that he's going to avail himself of while in BOP custody.  And

11  then the family and I have talked, and I know they've talked

12  to him, and they understand that based on his community

13  friendships, they want him to have a fresh start.  They are

14  coming up with a plan of where can we help him be in order to

15  succeed.

16         He understands that he's going to make different life

17  choices, meaning different friends, different associations.

18         So it is a plan of GED, Social Security and then what

19  other classes along the way while he works.  He wants to work.

20  That is one of the things that he looks forward to the most

21  with the Social Security number.

22         So that's the initial plan, Your Honor, and I think

23  that that is going to lay the foundation for him ultimately

24  being that productive member of society that he truly wants to

25  be and that he has the support of his family to be.

1    THE COURT:  He has served some custody time

2    previously in the IDOC, is that correct, on this burglary

3    charge from 2015?  It looks like he was in custody for a

4    little over a year before he was paroled.

5    MS. RAMIREZ:  He did, Your Honor.  And then on this

6    case, which was one of the things as well that I hope that the

7    Court takes into consideration, is the seven months that he

8    spent in custody at the Cook County Jail prior to being

9    detained in federal custody on these same charges.

10    THE COURT:  So I'd like to give you a chance to

11    respond to this one point about his criminal record that does

12    concern me which is he has these prior offenses.  They don't

13    appear to be in the same league in terms of the violence that

14    was used, the use of weapons, threatening people personally in

15    order to get their vehicles, but these prior offenses do

16    involve cars.  One would assume checking cars is because

17    you're trying to find one that's ripe to be stolen.

18    This latest crime that he's pled guilty to just seems

19    to take it to another level, actually face to face with the

20    victims, weapons.  That situation could have escalated very

21    quickly to something really bad.  I can imagine, you know,

22    you've got this couple, the wife's pregnant.  They're worried

23    about their unborn child, no doubt.  Who knows what they might

24    have irrationally done in the moment to try to protect that

25    child that could have escalated things and led to a lot of

1    people getting hurt.

2          To be specific about what concerns me is Mr. Liberty

3    had just had his parole discharged, he hadn't been out of

4    custody really all that long, I guess, you know, maybe a

5    little over two years, maybe a little over three years, when

6    this happened.

7          Should I be concerned that that prior time that he

8    spent in the IDOC didn't deter him from getting into more

9    trouble, but as soon as he's got that kind of behind him and

10   discharged, it ramps up, and he engages in a crime that's even

11   more serious?  Should I be concerned that the time in custody

12   didn't deter him, and, instead, he seemed to be going in the

13   wrong direction?

14         MS. RAMIREZ:  So Your Honor, Paragraph 33, the

15   offense which we're discussing, he was 18 years old at the

16   time.  I can't tell the Court that I know definitively when

17   that light went on for Mr. Liberty.  And on its face, the

18   Court correctly states, you know, he did this time in IDOC,

19   that didn't seem to impact his decision making to make better

20   decisions.

21         Your Honor, all I can submit to the Court is at 18

22   his willingness and desire to go out and, you know, help

23   support his family and get a job, and it's met with roadblock

24   after roadblock because he cannot get employment, full-time,

25   legal employment, not just doing some lawns but honest

1   employment.  He continued, obviously, by his involvement in

2   this case to use the thinking processes that had not served

3   him well.

4        I'm asking the Court humbly to -- if you listen to

5   his words today and the time that he has spent in custody and

6   the growth that I think his family could attest to as well as

7   myself that I think this is where the break in that pattern

8   occurs.

9        The fact that he was able to do classes affirmatively

10  that he sought out at Livingston, that he started to lay the

11  groundwork for the tools necessary to be successful, the

12  thinking for a change, the identifying what factors are

13  contributing to my poor decision making, if he has now started

14  to build on that foundation and will continue to do so during

15  this next period of incarceration, then, Your Honor, I would

16  submit that this is the chance that he has after his release

17  to take the cumulative education, the cumulative growth and

18  say, "We're going to give you a chance and not just look at

19  this crime, Paragraph 33, and the current one to determine

20  should I be worried in the future."

21       We can't change backwards, but we know what he's done

22  and what he will continue to do to prove to the Court that he

23  won't be back around and this isn't going to be a

24  merry-go-round for him.

25       THE COURT:  Anything further, Ms. Ramirez?

1          MS. RAMIREZ:  Thank you, Your Honor.

2          THE COURT:  Does the Government have any response to

3     that argument?

4          MR. STORINO:  No, Your Honor.

5          THE COURT:  Then at this point, if I think it was

6     Patrice Liberty, you wanted to make a statement.  So

7     Ms. Liberty, this is an opportunity if you'd like to say

8     something on Mr. Liberty's behalf.

9          Because we're trying to keep everybody safe, I'm

10    going to ask you to use the microphone.  There's a microphone

11    over on the corner of the jury box over there.  It's got a

12    cover on it.  And there's a little blue X on the floor.

13         And whenever you're ready, just state what your name

14    is, and then you can tell me whatever you need to say.  And

15    yes, feel free to have a seat and pull it down.  That's fine.

16         MS. PATRICE LIBERTY:  Hello.  My name is

17    Patrice Liberty.  I'm Dwayne Liberty's second aunt, second

18    oldest aunt.  I just wanted to say Dwayne Liberty is a very,

19    very hard-feeling child.  He has always been that way.  He's

20    always been the one that would come check on you, to come

21    hands on with making sure everyone in the family is okay.

22    Dwayne has always been that way.

23         I want to say everybody make mistakes, some more than

24    others.  You know what I'm saying.  He has messed up, but now,

25    as we talk to him and seeing his train of thought, Dwayne has

1  grew a whole lot, like, from trying to make it to knowing what

2  he has to do to make it instead of making dumb decisions, if

3  you kind of get what I'm saying.

4       One thing I miss which -- I miss him coming to check

5  on me.  And I want to tell him, Dwayne, I'm going to be okay,

6  so you don't have to worry about me not being here when you

7  get out of here.  And I don't feel like saying too much, just

8  to let you know I love you.  Okay?

9       That's all, Your Honor.  Thank you.

10      THE COURT:  Thank you, Ms. Liberty.

11      Okay.  Mr. Liberty, you've heard what the

12  Government's attorney had to say, you heard your attorney,

13  you've heard what your aunt had to say.  Now, if you would

14  like, it's your turn.  As I said before, you don't have to

15  make a statement if you don't want to, but if you do, I will

16  listen to it.

17      Would you like to say something?

18      THE DEFENDANT:  Yes, Your Honor.

19      THE COURT:  Okay.  Go ahead.  And if you would like

20  to lower your mask so that I can see you better, feel free.

21  If you're more comfortable wearing it, that's fine, too.

22      THE DEFENDANT:  Should I stand or just --

23      THE COURT:  If you'd like to stand, that's fine.

24  Make sure you kind of turn the microphone up so we can still

25  hear you.  I think we'll be able to hear you fine.

1        THE DEFENDANT:  Well, I wrote a letter, and I was

2 going to start by saying that I humbly and respectfully bring

3 myself forth at the mercy of this Court today.

4        I would like to start by speaking my peace to all my

5 loved ones that I'm sorry for putting you all through this,

6 through this whole ordeal.

7        And I would just like to thank my lawyer for all of

8 her assistance.  Through my time of being incarcerated, she

9 helped me out a lot.

10        And I just want to thank everyone present on behalf

11 of the courts.

12        At the time from the inception of this incarceration,

13 I have grown as an individual mentally and physically.

14 Personally, I know this time away from my everyday freedom

15 will be a constant reminder that one bad choice affects not

16 only me but also other loved ones that I really didn't even

17 know as in the victims.  And I just want to take this time to

18 apologize to all the victims and putting them also through

19 this whole ordeal.  I'd like to sincerely apologize to them

20 and all their loved ones.

21        I look forward to participating in and finishing all

22 education and mental, physical, and religious programs offered

23 to me.

24        And another thing with my, like, birth certificate

25 and paperwork, it wasn't that -- I don't want the Court to

1    think that I didn't try.  It was something that was on my mind

2    every day from the time that I was released from IDOC, but I

3    was just being railroaded a lot, saying that you need this to

4    get this, but if you have nothing to start from, it's just a

5    railroad.  And that's another thing.

6           I just want to let the Court also know that the

7    sentence imposed today, Your Honor, it will be a turning point

8    for myself, and I just want to be a better man for those in my

9    community.

10          And also, I understand that you was saying how from

11   my other times being released and this time, I didn't have a

12   plan.  Like, my plan was to just -- only thing I wanted to do

13   was just come home, and that's it.  That was my plan, just to

14   come home, but now I really have a plan.  Like, I understand

15   family is precious and life is precious itself.  I didn't

16   understand that when I was younger.  I didn't even know I was

17   going to make it to see that, to get in my 20s, you know.  And

18   I probably wouldn't have if I wasn't incarcerated, doing the

19   things that I was doing.

20          But with that being said, I just want to thank you

21   for your time and your understanding, Your Honor.

22          THE COURT:  Thank you, Mr. Liberty.

23          THE DEFENDANT:  One other thing I would ask.

24          Can I tell my grandma -- because today is her

25   birthday, I want to tell her happy birthday.  That was another

1    reason why I decided not to do the video visit was to see my

2    grandma.

3            THE COURT:  And I want to let you know, Mr. Liberty,

4    it's fine that you wanted to do this in person.  You know,

5    we're always concerned with everything going on.  And we have

6    offered people to be able to do things by video, and a lot of

7    people have agreed to do that, but you're not going to be

8    punished or penalized in any way because you decided to do

9    this in person.  That is your right, and, you know, for some

10   defendants, they're more comfortable doing it by video

11   because, you know, they might feel that it's safer and they

12   don't have to worry about being quarantined and things like

13   that, but that's a decision everyone has to make for

14   themselves, and nobody is going to hold it against you in any

15   way that you decided to come here.  I completely understand

16   why you made that decision.  Okay?

17           THE DEFENDANT:  Yes, Your Honor.

18           THE COURT:  Thank you, Mr. Liberty.  Was there

19   anything else you wanted to say?

20           THE DEFENDANT:  No, Your Honor.

21           THE COURT:  Okay.  Thank you.

22           Put your mask back on.  Thanks.

23           Mr. Storino, I did have one other question for the

24   Government before I make a decision here.  Should I, in

25   considering a sentence for Mr. Liberty, take into account in

1 any way the earlier carjacking of the Prius which was an

2 offense that Mr. Carter admitted that he was involved in?

3       I don't believe the Government is saying Mr. Liberty

4 was involved in that carjacking; however, he was in the car,

5 and that incident is mentioned in his Presentence

6 Investigation Report. So I wanted to make sure I'm clear on

7 the Government's position. Should I completely disregard it,

8 or is it relevant in some way?

9       MR. STORINO: It's not relevant when you're

10 sentencing Mr. Liberty for what he did.

11       The Government's evidence is that one witness who is

12 looking down from a window identified Mr. Liberty 50 percent.

13       You know, Judge, I thought long and hard about it,

14 but I don't think that's beyond a preponderance of the

15 evidence, so I'm not asking the Court to consider it. I think

16 we should only consider the one carjacking that Mr. Liberty

17 has acknowledged.

18       THE COURT: I take it, Ms. Ramirez, that you would

19 agree with that?

20       MS. RAMIREZ: Absolutely, Your Honor.

21       THE COURT: And that's how I'm going to approach it.

22 I agree. I think that there's certainly not enough evidence

23 in the record for me to draw any conclusions about who else

24 was involved in that, whether it was Mr. Liberty or

25 Mr. Gordon, or somebody else, so I'm not going to consider it

1    at all.

2           Ms. Ramirez, you indicated that you wanted to raise

3    an issue with at least one of the supervised release

4    conditions.

5           MS. RAMIREZ:  That's correct, Your Honor.  Page 22,

6    Paragraph 16, just the at-work permitting of the probation

7    officer to visit at a reasonable time or as specified, Judge,

8    just the at-work.  Obviously, the at-home, school, community

9    service location or other reasonable location specified, we

10   have no issue with that.

11          I think the at-work, I make it a point just because

12   of all of the biases already included when someone has, you

13   know, a case and a probation officer.  And then the way I see

14   this one specifically as it relates to Dwayne is just the fact

15   that, you know, it's been so hard for him to get a job

16   already, and there's every other place that Probation can do

17   that.  So that was the only one that we were asking the Court

18   to exclude, but everything else we're in agreement with.

19          THE COURT:  Including that he observe the re-entry

20   court session?

21          MS. RAMIREZ:  Yes, Your Honor.  We talked about it.

22   I did not go at length with him, but I think that given his

23   position on everything that he feels is going to be beneficial

24   in providing those tools, I think that that would be

25   beneficial as well.

1        THE COURT:  And I know the recommendation from
2    Probation is that he observe one re-entry court.  I know my
3    colleague who is very involved in the re-entry court always
4    asks that we direct them to observe two rather than one.
5        I'm inclined to make that change in the conditions of
6    supervised release.  Certainly if he observes one and he's
7    completely turned off by it, he can tell his probation
8    officer, and I wouldn't require him to go if the probation
9    officer doesn't direct him to, but I think seeing two is
10   probably helpful.
11       And Mr. Liberty, just so you know what that's about,
12   that's a voluntary program.  So that's not something I direct
13   you that you have to join.  You just have to go and check it
14   out, and if it's something that you're not interested in,
15   nobody's going to make you join it.  And, in fact, even if you
16   are interested in it, you do have to qualify, and they select
17   you for it, but it is a program to help people like yourself
18   who have a lot of potential when they're coming out of custody
19   who just need that additional support and structure to get on
20   their feet, find a job, get their GED, and do all those things
21   that will help you be a productive person down the line.  So
22   keep that in mind.
23       Does the Government have any objection to leaving out
24   the at-work requirement?
25       MR. STORINO:  No, Your Honor.

1     THE COURT:  And just so I can have it in mind as I'm

2  determining a sentence here, is there any issue of restitution

3  for this defendant?

4     MR. STORINO:  No, Your Honor.

5     The same as with Mr. Carter.  We reached out, and

6  actually, Your Honor, just to be clear, I did speak to the

7  case agent recently, and as to this particular offense, the

8  white Land Rover, the car was returned and there was very

9  minimal damage done to it, so I don't think there would be any

10  need for restitution to the victim of this particular offense.

11     THE COURT:  Okay.  I'll just ask Counsel to give me a

12  moment here.

13     Okay.  If there's nothing further from Counsel, I'm

14  prepared to impose a sentence here.

15     This is always a difficult task to sentence somebody,

16  particularly when they're going to be going to prison for a

17  period of time.  And it's particularly difficult here when I

18  have somebody who's committed what I think is a really serious

19  crime with victims who undoubtedly suffered great trauma on

20  the one hand, and, on the other hand, I also have somebody who

21  committed this crime who I think does have a lot of potential,

22  who has support from his family.

23     Many of the defendants who come in my courtroom don't

24  have that kind of support, and I believe that Mr. Liberty's

25  expression of remorse is genuine, that he is thinking about

1   the victims of the crime and understanding what that meant for

2   them.  I think he does appreciate that.

3        And so the challenge is to try to find the sentence

4   that recognizes the seriousness of this offense and sends the

5   right message that this is something that can't be repeated by

6   Mr. Liberty or others but also doesn't unnecessarily penalize

7   Mr. Liberty or doesn't sell short the potential that he has.

8        I've considered all the arguments that were

9   presented, the information in the Presentence Investigation

10  Report and elsewhere in the record, the letters that were

11  submitted, and, of course, the guideline range which is

12  advisory, and at the end of the day, what I have determined is

13  to impose a sentence of 75 months followed by three years of

14  supervised release.  And here's why.

15       After considering all of the factors:  One, I am

16  taking into account, of course, Mr. Liberty's personal history

17  and characteristics, his background.  As I said, there are

18  things here that are very positive.  He's got the support of

19  his family, he has a lot of potential and has shown by his

20  plan that he has and what he wants to do.  He's young, he's

21  got a lot of time to try to put that plan into action.

22       So I've taken all that into account, but I do think

23  that the prior criminal history is concerning, and it's

24  concerning because it does seem to show that there's a pattern

25  of conduct that is getting worse.  And one would hope that

1   when you have to do your first real time in a state prison for

2   any period of time that maybe that's a thing that sends the

3   message to turn things in the other direction.

4           So he comes out of custody in 2016. He's on parole

5   for a couple of years. He finally gets his parole discharged,

6   he's got that prior sentence behind him, and three months

7   later, he's involved in this situation. And now there are

8   guns involved and now he's face to face with other people and

9   taking the vehicle.

10          And I don't know why. I'm inclined to just think

11  it's the kind of thing that you do when you're young and you

12  get caught up with other people and you make bad decisions and

13  you probably aren't thinking in that moment of what it is to

14  be on the other side of the gun standing there with your

15  family and your unborn child and worried for your safety at

16  your home.

17          I'm willing to think he probably didn't even have a

18  chance to think about that at the time, but I have to think

19  about that now and make sure that the sentence that I give him

20  sends a message that this is your chance. This is a real

21  sentence. When you serve it and you put it behind you, you

22  can go forward.

23          If you find yourself after you've served the sentence

24  back in trouble again, it's going to be an even more serious

25  offense with even longer time. So this is very much the

1  make-or-break opportunity for Mr. Liberty, and I think it

2  requires a significant sentence to represent that and send

3  that message.

4        Obviously, I'm considering the need to promote

5  respect for the law and to deter Mr. Liberty and others from

6  engaging in these sorts of crimes and need to protect the

7  public from these sorts of crimes.

8        With all of the issues we have with gun violence

9  going on in the city right now, I don't think anybody needs to

10 be reminded how important it is to recognize that and that

11 things escalate when guns are involved, and people get hurt

12 and killed.  Sometimes it's the person who has the gun who

13 ends up being on the wrong side of things, and I think that is

14 something that needs to be taken into account.

15        This sentence is lower than the sentence that I gave

16 to Mr. Carter by a little over two years.  I believe I gave

17 Mr. Carter 100 months.

18        I haven't considered Mr. Gordon yet at all because he

19 has not pled guilty or gone to trial and does not have a

20 conviction.

21        I think that difference in sentence adequately takes

22 into account the need to recognize that Mr. Liberty's conduct

23 here is less aggravating than that of Mr. Carter's.

24 Mr. Carter had two incidents.  Every indication is that

25 Mr. Carter was involved in some actual use of violence

1    involving guns.  I don't have that in front of me with

2    Mr. Liberty, and I'm prepared to fully accept that he is an

3    individual out of the three who was just holding the gun and

4    not one of the ones who was actually directly threatening the

5    two victims to get their vehicle.

6          And then I do also want to point out the sentence I'm

7    imposing of 75 months is within the guideline range regardless

8    of whether I agreed with the defense argument on the use of a

9    firearm adjustment or not.  And frankly, the sentence would

10   have been the same regardless of whether I found the higher

11   guideline range.

12         Again, I'm looking at it in terms of what I think is

13   sufficient, not greater than necessary.  In this case, I think

14   the guidelines are in line with that.  That's not always the

15   case, but here, I think that they were.

16         So I've considered all of those things.  I'm going to

17   go over in a moment all of the conditions of supervised

18   release that are going to be imposed.

19         I'm going to take the suggestion of defense counsel

20   and not include the requirement that Mr. Liberty be subject to

21   visits from his probation officer while he is at work.  And I

22   hope he is at work once he's released and has a job and is

23   able to do that.

24         Pursuant to the Sentencing Reform Act of 1984, it is

25   the judgment of the Court that the defendant, Dwayne Liberty,

1  is hereby committed to the custody of the Bureau of Prisons to
2  be imprisoned for a term of 75 months.

3       Upon release from imprisonment, the defendant will be
4  placed on supervised release for a term of three years.

5       Within 72 hours of release from the custody of the
6  Bureau of Prisons, he shall report in person to the probation
7  office in the district to which he is released.

8       I am not imposing a fine due to the defendant's
9  inability to pay, however, there is a $100 special assessment
10 that is due immediately.

11      While on supervised release, the defendant shall
12 comply with the following mandatory conditions:  He shall not
13 commit another federal, state or local crime; he shall not
14 unlawfully possess a controlled substance; he shall cooperate
15 with the collection of a DNA sample at the direction of his
16 probation officer if such a sample is required by law; and he
17 shall refrain from any unlawful use of a controlled substance
18 and submit to one drug test within 15 days of release on
19 supervised release and at least two periodic tests thereafter,
20 up to 104 periodic tests for use of a controlled substance
21 during each year of supervised release.

22      The defendant shall also comply with the following
23 discretionary conditions:  He shall seek and work
24 conscientiously at lawful employment or pursue conscientiously
25 a course of study or vocational training that will equip him

1    for employment; he shall refrain from knowingly meeting or

2    communicating with any person whom he knows to be engaged in

3    or planning to be engaged in criminal activity; and he shall

4    not knowingly meet or communicate with the following persons:

5    His codefendants in this case:  Tyran Carter and

6    Terronde Gordon.

7            The defendant shall refrain from excessive use of

8    alcohol which means having a blood-alcohol concentration of

9    greater than .08 percent or any use of a narcotic drug or

10   other controlled substance without a prescription by a

11   licensed medical practitioner.

12           And defendant shall refrain from possessing a

13   firearm, destructive device, or other dangerous weapon.

14           He shall participate at the direction of a probation

15   officer in a substance abuse treatment program which may

16   include urine testing up to a maximum of 104 tests per year.

17           And he shall participate at the direction of a

18   probation officer in a mental health treatment program and

19   take any medications prescribed by the mental health treatment

20   provider.

21           So those treatment programs, Mr. Liberty, that's if

22   your probation officer thinks that it's useful for you to do

23   so.  And it may not be, but they will have that ability given,

24   you know, some of the things you've been dealing with.

25           The defendant shall not knowingly leave the federal

1    judicial district where he is being supervised unless granted

2    permission to do so by the Court or probation officer.  The

3    Northern District of Illinois which is where we are now

4    consists of Cook, DuPage, Grundy, Kane, Kendall, Lake,

5    LaSalle, Will, Boone, Carroll, DeKalb, Jo Daviess, Lee,

6    McHenry, Ogle, Stephenson, Whiteside, and Winnebago Counties.

7         The defendant shall report to the probation office in

8    the federal judicial district to which he is released within

9    72 hours of his release from imprisonment and shall thereafter

10   report to a probation officer at reasonable times as directed.

11        The defendant shall permit a probation officer to

12   visit him at any reasonable time at home, at school, at a

13   community service location, or another reasonable location

14   specified by the probation officer and shall permit

15   confiscation of any contraband observed in plain view of the

16   probation officer.

17        And the defendant shall notify a probation officer

18   within 72 hours after becoming aware of any change in

19   residence, employer, or workplace and, absent constitutional

20   or other legal privilege, answer inquiries by a probation

21   officer.

22        Defendant shall answer truthfully any inquiries by a

23   probation officer subject to any constitutional or legal

24   privilege.  And the defendant shall notify a probation officer

25   within 72 hours if arrested or questioned by a law enforcement

1    officer.

2           And then finally, I'm imposing the following special

3    conditions which I think are necessary and appropriate in

4    light of the defendant's personal history and characteristics

5    and to help him reintegrate back into the community and for

6    him to be effectively supervised by Probation.

7           If he has not obtained a high school diploma or

8    equivalent, he shall participate in a General Educational

9    Development or GED prep course and seek to obtain a GED within

10   the first year of supervision.

11          He shall participate in an approved job skill

12   training program at the direction of a probation officer

13   within the first 60 days of placement on supervision.

14          If unemployed after the first 60 days of supervision

15   or if unemployed for 60 days after termination or layoff from

16   employment, he shall perform at least 20 hours of community

17   service per week at the direction of Probation until gainfully

18   employed.  The maximum amount that he shall be required, it

19   would be 300 hours.

20          He shall not enter into any agreement to act as an

21   informer or special agent of a law enforcement agency without

22   the permission of the Court.

23          And the defendant shall observe two re-entry court

24   sessions as instructed by your probation officer.

25          So again, Mr. Liberty, if it just turns out after the

1     first one that you're just not interested, let your probation

2     officer know, and they'll decide whether to send you back to

3     check it out again.

4            These are the conditions of release.

5            Ms. Ramirez, were there any of the conditions of

6     supervised release that you feel should be explained more or

7     more supported by the record?

8            MS. RAMIREZ:  I don't believe that's necessary, Your

9     Honor.  Thank you.

10           THE COURT:  Okay.  Are you satisfied that I addressed

11     the main arguments in mitigation?

12           MS. RAMIREZ:  I am.  Thank you.

13           THE COURT:  Are there any counts to be dismissed

14     here, Mr. Storino?

15           MR. STORINO:  No, Your Honor.

16           THE COURT:  Okay.  And there's no issue of

17     restitution.  Is there any issue of forfeiture here?

18           MR. STORINO:  No, Your Honor.

19           THE PROBATION OFFICER:  Excuse me, Your Honor.

20     Danielle from Probation.

21           THE COURT:  Yes.

22           THE PROBATION OFFICER:  Would you like to waive the

23     costs of custody and supervised release?

24           THE COURT:  Yes, I will waive that.

25           Is there any objection, Mr. Storino?

1          MR. STORINO:  No, Your Honor.

2          THE COURT:  That will be waived.

3          Thank you very much, Ms. Stern.

4          Was there anything else that you needed from me or

5     anything I missed?

6          THE PROBATION OFFICER:  No, Your Honor.

7          THE COURT:  Thank you.

8          Ms. Ramirez, do you have a request for a designation?

9          MS. RAMIREZ:  I do, Your Honor.  I have two requests:

10    One, a facility as close to Chicago as possible to facilitate

11    family visitation.

12         THE COURT:  I'll do that.

13         MS. RAMIREZ:  His whole family lives here in the

14    area.

15         And then secondly, Your Honor, would the Court find

16    it appropriate to please recommend credit as of July 20, 2018,

17    which is the date of arrest?

18         THE COURT:  So I'm going to do here what I also did

19    for Mr. Carter, and I'm going to note it in the judgment that

20    the intent is for him to get credit from that date of the

21    arrest.

22         That's my understanding of how it would work under

23    the BOP regulations because his state charges were dropped.

24    So as I understand it, he will get credit for that time

25    because that time is not counted towards another state

1    sentence.  If I am wrong about that and the time is counted

2    somewhere else, then it should be counted elsewhere.

3         So that's, I think, the language I used for Carter,

4    indicated at the time would be credited from, in this case,

5    July 20, 2018, to the extent not credited towards another

6    sentence, something along those lines.  I believe that's in

7    line with the statute and the operation of the rule, and so

8    there shouldn't be any confusion.

9         Anything else in terms of recommendations?

10        MS. RAMIREZ:  That's it.  Thank you.

11        MR. STORINO:  Your Honor, can I have one moment?

12        THE COURT:  Sure.

13        MS. RAMIREZ:  We'd ask if you would be inclined to

14   also order the RDAP program as a recommendation.  It was

15   included in the probation officer's recommendation.

16        THE COURT:  This is based on the prior history of

17   marijuana use?

18        MS. RAMIREZ:  Yes.

19        MR. STORINO:  It's in the PSR, Your Honor, on

20   Paragraph 75 as well as the defendant also noted that he used

21   promethazine and codeine.

22        THE COURT:  Yeah, I'll recommend that he be

23   considered for RDAP.  Ultimately, it's not my decision of

24   whether he qualifies, but I know that they'll take it into

25   account.  Good.

1          Mr. Liberty, you may appeal your conviction if you

2    believe that your guilty plea was somehow unlawful or

3    involuntarily or if there was some other fundamental defect in

4    the proceedings that you didn't waive your right to appeal

5    through your guilty plea.

6          You may also appeal your sentence.

7          Any notice of appeal must be filed within 14 days of

8    the entry of judgment or within 14 days of the filing of the

9    notice of appeal by the Government.

10         If requested, the clerk will prepare and file a

11   notice of appeal on your behalf.  If you cannot afford to pay

12   the cost of an appeal or for appellate counsel, you can ask to

13   appeal in forma pauperis, which means to have the fee waived.

14   And you can ask for court-appointed counsel on appeal.

15         I believe I've covered everything.  Is there anything

16   else, Mr. Storino?

17         MR. STORINO:  Your Honor, I just have one other thing

18   which is my exhibits.  I would like just for them to be made

19   part of the record for appeal, but I would ask that they not

20   be placed on the public docket because they do show the images

21   of the victims.

22         THE COURT:  So you are tendering them to the Court in

23   order -- why are you tendering to the Court rather than filing

24   them so that they can be kept -- because in general, if

25   they're tendered to chambers but not put on the docket, they

1    wouldn't be part of the record under appeal.

2           You can tender them to chambers and we can file them

3    on the docket under seal, or I can grant you leave to file

4    them under seal, but one way or the other, they would need to

5    make it onto the docket.  They don't have to be made public.

6           MR. STORINO:  If the Court would be inclined to grant

7    leave under seal, Your Honor, I would appreciate that.

8           THE COURT:  Yeah, that's fine.  I'll grant you leave

9    to file.  And let's be clear which ones because you've

10   designated them in court as Government's Exhibits 1 and 2.

11          MR. STORINO:  Exhibits 1 through 7, actually.  And I

12   did provide copies to defense counsel.

13          MS. RAMIREZ:  That's correct, Your Honor.

14          THE COURT:  And these are the same photos that are in

15   the Government's version of the offense?

16          MR. STORINO:  They are, Your Honor.  They're just in

17   color and larger photographs.

18          THE COURT:  Okay.  So that will be -- you're granted

19   leave to file those on the docket under seal, and they'll be

20   made part of the record.

21          MR. STORINO:  Thank you, Your Honor.

22          THE COURT:  Anything else, Mr. Storino?

23          MR. STORINO:  No, Your Honor.  Thank you.

24          THE COURT:  Anything else, Ms. Ramirez?

25          MS. RAMIREZ:  No, Your Honor.  Thank you.

1        THE COURT:  Anything else Ms. Stern?

2        THE PROBATION OFFICER:  No, Your Honor.

3        THE COURT:  Okay.  Then I believe we're finished.

4        Here.  Thank you all, and thank you for following all

5   of our procedures.

6        Mr. Liberty, I do wish you all the best of luck.  I

7   know the sentence that I gave you probably sounds like a long

8   time, but you're going to come out and you're going to have so

9   much of your life ahead of you to do all kinds of great

10  things, so I'm going to choose to believe that that's what

11  you're going to do.

12       THE DEFENDANT:  Thank you, Your Honor.

13       THE COURT:  Good luck to you.

14       THE DEFENDANT:  You, too.

15       THE COURT:  We're adjourned.

16     (Proceedings adjourned at 4:03 p.m.)

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

        I, Brenda S. Tannehill, certify that the foregoing is

a complete, true, and accurate transcript from the record of

proceedings on July 23, 2020, before the HON. ANDREA R. WOOD

in the above-entitled matter.


*/s/Brenda S. Tannehill, CSR, RPR, CRR*                10/22/2021

        Official Court Reporter                        Date
        United States District Court
        Northern District of Illinois
        Eastern Division